The next case is Shaparro v. John Varvatos Enterprises. Good morning, Your Honors. My name is Bill Dunnegan. I represent the plaintiff's appellants. What I'd like to do, since I have no adversaries, is to focus on what I think is financially the most important argument on the appeal. And that is whether or not the magistrate judge, sitting as a district judge, abused his discretion in determining whether or not the attorney's fees that we actually, in good faith, put in should be cut in half. Now, our basic position is that the district court abused its discretion in two respects. One, the district judge failed to consider the actual hours that our adversary, Hughes, Hubbard, and Reed, put in to litigate the case. This was a — But my understanding was there was no request or documentation on that in the district court. Well, the — Did I misunderstand? Well, I — to some extent, Your Honor. Please. What we did was we invited the other side in our opening brief, Hughes, Hubbard, and Reed, to say, look, if you think our fees are excessive, let's see what you — the hours that you put into this case. And they declined to put in any evidence whatsoever of the number of hours that they put into the case. And did you move for the district court to ask them to submit their hours for comparison? No, we did not. We did not move, Your Honor. But what we did was we said you should draw an adverse inference, because they have these in their control, and they've decided not to use them. And the inference should be that if they would have helped them, if they put 2,000 hours into the case, they certainly would have put those forward. We don't think that was the case. It would have been — But the burden was on you. Well, at the end of the day, that is absolutely correct. But in order to meet that burden, we should be able to use an inference based upon the other side's inability or refusal to put on the table documents which are in their control. Isn't it a pretty hard inference to weigh, though? I mean, without some knowledge of what their bills reflected, what is the district court supposed to do with that information? Well, there's a little bit — there's a little bit more to it than what their bills themselves would show. There was evidence in the record that we adduced at one point that for one calendar year, Varvatos spent $1 million defending this case. And we know that when Varvatos filed bankruptcy, Hughes, Hubbard, and Reed filed a claim for over $2 million, which was unpaid at that point. Now, we don't — we don't know exactly what matters that was for, but, you know, it seems to me that there's a very clear inference. There was a lot of money changing hands or being billed by Hughes, Hubbard, and Reed to Varvatos in order to defend this case. The second thing that we think the district court should have looked at or considered, which he did not, was what is the relationship between the result achieved and the amount of hours that were put in? Now, I don't think there's any question that the district court said that we did — we achieved the best possible result available in this case. Now, then he went back and he looked at other garden variety cases and said, well, in these cases, which went to trial, there were only these hours involved. And I'm — I'm here to argue that that is really an abuse of discretion because you're comparing apples to grapefruits. Well, did you — did you submit any apples to the court? I mean, the argument is made that nothing that you provided was a comparable case in the sense of a class action to compare it with. Is that wrong? I don't think that's wrong, Your Honor. We cited — I mean, it's a legal issue, but we cited in our brief in this court a handful of cases where there were 5,000 or so hours approved in an employment case, class action case, which didn't go to trial. Yeah. The other thing that I wondered about — actually, I have only two questions, so I'll try to ask them both quickly. One is class actions are often extremely complicated, and one of the things that complicates them is that trying to keep the class together or figure out whether it is a class and is everybody similarly situated, and then when you get to the damages phase, still you have to have a whole process to decide who lost what because it's a principle that they have in common. But here it seemed to me this was a very straightforward case. It wouldn't have been that much different if it had only been one plaintiff, except that more money is on the line. But essentially it's a policy that affected all the female employees and all the male employees, and the damages, whatever they were — that was an interesting and novel issue — would be simple. So what about the classness escalated this? For example, the certification of additional opt-in plaintiffs. That's usually granted as a matter of course. Barbados opposed it. We had to defend that. On the class issue, they opposed our application on every conceivable ground, including that we were incompetent. That added something to it. Now, I'm not here to tell you that all of those hours that we spent were because it was a class action. The real time suck in this case was the fact that it was very difficult to prove the amount of damages that the females had sustained because the men were getting clothes, and they were getting clothes that they had to wear, and it's not clear at what point you would value the clothes. It's not clear what those clothes would really be worth after three months. We made an argument. I get that that's a complicating factor, and that goes into how much time had to go on. I'm just saying one of your main points is that this is apples and oranges because this is a class action, and the oranges are one-man cases or one-woman cases. That's one of the reasons it's apples and grapefruits. The other reason is that this is a novel case. He gave us that, and the real thing that made it time – probably the principal reason that this became time-consuming was we had to figure out how to present to a jury the fact that even though it was a men's clothing store and the men got a benefit and you couldn't give the exact same benefit to the women, that that was still some sort of unequal pay. And that was the hard part because it's not just – I mean the magistrate judge had a real problem with that at summary judgment. I mean he was saying it's not clear that the women were paid anything less. And he tried to cap it, and that didn't work either. I understand that point. And the last question is just a practical one that I don't think has legal bearing. I'm just trying to get my head around it. You're arguing against an empty chair because the empty chair sent us a letter saying we don't care because there's no money. We're not going to have to pay. So what are the financial arrangements on two fronts? One, what did the class actually get and what's securing that? They actually got this money, not just the judgment. That's one part. And then the second part is if you win, where's the money going to come from that you'll win? Okay. The money that has changed hands so far is roughly $196,000 that came out of Barbados bankruptcy in Delaware. We got roughly eight, seven, eight cents on the dollar. That's all we're going to get out of the defendant, John Barbados, in. Now, there's two additional pockets. And then of that $196,000, I think that's still sitting in our escrow account, even though we would have an attorney's lien on that amount. Just we're maintaining the status quo. The money that we hope, expect to come is from two sources. One is we have a case pending before Judge Cote now against the insurer of Barbados saying that we are entitled to recover under that judgment for the amount of your policy. Okay? We don't know exactly what the amount of the policy is. It was originally $5 million and was paid down as a result of defense costs in this case. The second is in the Barbados bankruptcy, we asserted an adversary proceeding for equitable subordination under 310 of the Bankruptcy Code against Barbados' parent saying two things. One, you instigated to some extent this policy back in 2013, 2014. And secondly, you knew about this policy going on. A, how much money is optimistically in those? And are you going to get that or are your clients going to get that? Well, with respect to the insurance case against Ironshore, we don't know exactly what the policy limit is. Assume it's $3.5 million. If it's $3.5 million and we win that case, then we'll take our attorney's fees, I guess, and then the rest will go to the claimants pro rata. Because I think that there's going to be some— Why do the attorney's fees come first? I mean, this is a fee-shifting case, isn't it? Is that what it is? Yes, that's correct. As opposed to a common fund case. Yes, that's correct. So you're going to get an award that is supposed to be paid. If Barbados was solvent, it would come from them. It would come on top of what they pay or from their insurers or whatever ultimately. But it would come from them and it would go on top of what they pay to your clients. That is correct. So in this circumstance, doesn't it go to the clients first or at least be split in some way? So at the end of the day, the clients will have gained no benefit and you're arguing about getting twice as much as— That is something that I'm really trying to avoid. But the way I understand the attorney's statute is that proceeds from the litigation will go to the attorney first. Well, that's if they agreed to pay you money. Did they? I mean, there's a retainer that they're going to pay you money? As opposed to you get an extra award as part of the damages that go to them that the defendant pays the attorney's fee. See, I think the technical reason or the technical factor that may answer this is that the award of attorney's fees is really an award to the— To the client. To the client. And then from that, they need to pay the attorneys. Okay. I mean— Okay, I understand. I'm just trying to understand is there any money here at all for anybody is the first problem. Let's say you rule in my favor completely on everything today. The answer is no. But I've still got these two proceedings going, one in the district court here, one in the Third Circuit in New Jersey. That answers my question. That's what I wanted to know. Thank you. Thank you. Thank you very much for hearing me, Alice. Thank you. That concludes the calendar for this morning, so I'll ask the clerk to adjourn court. Court stands adjourned. Thank you.